UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HUONG THU NGUYEN-WILHITE,<br><br>                        Plaintiff,<br><br>      -against-<br><br>TAPESTRY, INC.,<br><br>                        Defendant. | Case No. 1:23-cv-03339 (JLR)<br><br>**OPINION AND ORDER** |

JENNIFER L. ROCHON, United States District Judge:

Many employers extend conditional job offers to candidates and finalize the hiring process only after the candidates pass a background check.  When that background check returns information that would disqualify the candidate from employment, the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*, requires the employer to give the candidate a copy of the background check report and an opportunity to dispute its contents before taking an adverse action against them, such as rescinding the conditional offer.  Plaintiff Huong Thu Nguyen-Wilhite ("Plaintiff") alleges that Defendant Tapestry, Inc., ("Tapestry") failed to follow this requirement.  Before the Court is Tapestry's motion for summary judgment on Plaintiff's claims. For the reasons that follow, the Court GRANTS the motion.

## BACKGROUND

### I.    Relevant Facts

Tapestry is a retailer of leather goods that owns Coach, which has a storefront location in Scottsdale, Arizona.  Dkt. 69 ("JSUF") ¶¶ 1, 12-13.  Plaintiff interviewed for a sales associate position with the Scottsdale location's Store Manager Breanne Belle ("Belle") and District Manager Natalie Cohen ("Cohen") in November 2022.  *Id.* ¶ 13.  On November 15, 2022, Belle offered Plaintiff the position, subject to her passing a background check, which Plaintiff

authorized Tapestry to conduct on November 17, 2022. *Id.* ¶ 14-15. Her pay was set at $22.50 per hour. Dkt. 73-1 ("Def. RSUF") ¶ 57.

Tapestry requires all candidates to undergo such a background check as a condition of employment; primarily, the check concerns criminal conviction, employment, and educational history. JSUF ¶ 3. An outside vendor, First Advantage, Inc. ("FADV"), conducts these background checks on Tapestry's behalf. *Id.* ¶ 4. Once FADV has gathered relevant information about a candidate, it compiles that information into a report that it labels either "Pass" or "Decisional." *Id.* ¶ 6. Candidates who "pass" the background check (that is, those for whom the check returns "no criminal history or other disqualifying information") "move forward with Tapestry's onboarding process" with no further review by Tapestry. *Id.* ¶ 7; *see also* Dkt. 71 ("Pl. RSUF") ¶ 7. Where FADV finds "criminal history information that has not been pre-approved by Tapestry as non-disqualifying information," it marks the candidate's background check report as "Decisional." JSUF ¶ 8. Upon further review of Decisional reports, Tapestry marks the candidate with one of two statuses: "Eligible" (meaning the criminal history information is not disqualifying) or "On Hold" (meaning the candidate cannot be hired). JSUF ¶¶ 9-10; Pl. RSUF ¶ 10. If Tapestry applies the latter designation, FADV "send[s] a pre-adverse action letter, together with a copy of the background report itself, to the candidate," and the candidate has five business days "to dispute the contents of the report" with FADV. JSUF ¶ 11; Pl. RSUF ¶ 12. If the candidate's dispute is both timely and successful, then their "status changes to 'Eligible,' and Tapestry moves forward with their employment." Pl. RSUF ¶¶ 14-15. Otherwise, their status changes to "Ineligible," and FADV sends "an adverse action letter" to the candidate stating that Tapestry will not be hiring them. Pl. RSUF ¶ 16.

As the foregoing suggests, Tapestry typically requires candidates to pass the background check before they begin working. JSUF ¶ 3. In Plaintiff's case, however, the upcoming "busy

holiday season" presented "an immediate need" for a sales associate in the Scottsdale store.  *Id.*

¶ 16.  Accordingly, on November 18, 2022, Paul Andrews ("Andrews") — who oversees the

background check process for Tapestry, *see id.* ¶ 4 — cleared Plaintiff to begin working while

her background check was still pending.  Pl. RSUF ¶ 24; Def. RSUF ¶ 48.  Thus, she began

working on November 20, 2022.  Pl. RSUF ¶ 25.

According to Tapestry, FADV returned Plaintiff's background check report on November

28, 2022; the report itself states that it was completed on November 23, 2022.  *Id.* ¶ 26.  It

contained criminal conviction history for theft, drug crimes, and drunk driving, and therefore was

marked "Decisional."  *Id.*  This information was inaccurate (the convictions in fact "belonged to

a different person"), but Tapestry did not know that at the time.  Def. RSUF ¶ 50; Pl. RSUF ¶ 38.

After reviewing the report, Andrews emailed Cohen the following:

> I just got the background check back for NGUYEN-WILHITE, HUONG.  She has a
> criminal record.
>
> I provided the conditional clear to [Cohen] because the candidate indicated on her profile
> that she had no criminal history.  Had I seen the criminal record, I would not have cleared
> her.  On top of that, she falsified company documents.
>
> I have to send out our Pre-Adverse letter to her since we are taking action, but I'm
> holding off until she is spoken to first.

Pl. RSUF ¶ 27 (alteration in original).  Accordingly, when Plaintiff arrived for her shift on

November 28, Belle physically blocked her from entering and told her that, because of the results

of her background check, she could not work in the store and should instead go home.  Pl. RSUF

¶ 30; Def. RSUF ¶ 52.  The parties disagree over what exactly Belle said to Plaintiff during this

exchange, but it is undisputed that Plaintiff asked Belle for a copy of her background check

report, and that Belle did not provide one. Pl. RSUF ¶¶ 30-31; Def. RSUF ¶ 52.  The same day,

Plaintiff was marked "Terminated" in Tapestry's internal computer system.  Def. RSUF ¶ 53.

According to Tapestry, Plaintiff was assigned that status only because there was no other status

in its portal's drop-down menu that suitably described Tapestry's decision to revoke her conditional clearance.  *Id.*; *see* Dkt. 68-19 ¶¶ 6-9.

On November 29, after confirming that Belle had spoken with Plaintiff the day before, Andrews changed Plaintiff's status in the FADV system to "On Hold" and, around the same time, emailed Cohen:

> If the employee was told that the background did not clear and that she didn't provide accurate information on her background check profile, then I can send the letter out.  Please let me know if I can send the letter out.
>
> She can't be termed yet.  She must be allowed to contest the information that I'll be sending her.  Just keep her off the schedule.

JSUF ¶ 17.  As a result of the status change, FADV sent a pre-adverse action letter to Plaintiff on November 29, 2022, along with a copy of the background check report.  *Id.* ¶ 18.  The letter stated, among other things:

> Tapestry, Inc. has made a preliminary decision to rescind their conditional offer of employment at this time. . . .
>
> If you believe the information listed in the background verification report is not accurate, you must contact [FADV] within five (5) business days from the date of this letter. . . .
>
> We will not make a final decision regarding your employment eligibility until the 6th business day. . . .
>
> You will be advised by a separate notice if and when your conditional offer of employment with Tapestry, Inc. is rescinded or other adverse employment action is taken, based in whole or in part on the information contained in your consumer report.

Dkt. 72-9 at 2-3.

Plaintiff disputed the contents of the report with FADV shortly after receiving it.  JSUF ¶ 19.  Indeed, she called FADV for that purpose "several times in late November and early December 2022."  Def. RSUF ¶ 56.  She also contacted Belle multiple times to dispute the report.  *Id.* ¶ 55.  However, FADV never notified Tapestry that Plaintiff had lodged an official dispute with FADV.  Pl. RSUF ¶ 36.  Therefore, Tapestry made no change to Plaintiff's "On

4

Hold" status during the allotted time, and, on December 6, 2022, FADV sent Plaintiff an adverse action letter stating that her conditional offer of employment had been rescinded.  *Id.* ¶ 37.

## II.    Procedural History

Plaintiff initially filed this action against Tapestry on February 17, 2023, as a class action in New York state court.  JSUF ¶ 20; *see also* Dkt. 1-1 ("Compl.").  Tapestry removed the matter to this Court on April 20, 2023.  *See generally* Dkt. 1.  On July 26, 2024, Plaintiff moved for class certification.  *See generally* Dkt. 48.  The Court denied that motion on February 14, 2025, finding among other reasons that Plaintiff's "unique factual circumstances" — namely, that she had been conditionally cleared to work in-store while her background check was pending, then removed from the store's schedule during her dispute process — rendered her claim "not typical of those" in the proposed class.  *Nguyen-Wilhite v. Tapestry, Inc.* (*Tapestry I*), No. 23-cv-03339 (JLR), 2025 WL 504628, at *6-7 (S.D.N.Y. Feb. 14, 2025).  Following that decision, Tapestry moved for summary judgment.  *See* Dkt. 68; Def. SUF; Dkt. 68-2 ("Br."); Dkt. 68-3 ("Murphy Decl."); JSUF.  That motion is fully briefed.  *See* Dkt. 70 ("Opp."); Pl. RSUF; Dkt. 72 ("Soumilas Decl.")' Dkt. 73 ("Reply"); Def. RSUF.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  It is the moving party's burden to demonstrate the absence of any genuine factual dispute, and the Court "constru[es] the evidence in the light most favorable to the [nonmoving party] . . . [,] drawing all reasonable inferences and resolving all ambiguities in [its] favor."  *Jaffir v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018) (second and final alteration in original) (quoting *Darnell v. Pineiro*, 849 F.3d 17, 22 (2d Cir. 2017)).  To defeat a motion for summary judgment,

5

the nonmoving party must advance more than "a scintilla of evidence," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986), and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## DISCUSSION

The parties here do not significantly dispute the facts, but rather disagree on their legal implications. That disagreement gives rise to two issues that Tapestry asks the Court to resolve in its favor as a matter of law: first, whether Tapestry took an adverse action against Plaintiff by revoking her conditional clearance and removing her from Coach's Scottsdale store; and, if so, second, whether Tapestry acted negligently or willfully in taking that adverse action. The Court will address each issue in turn.

## I.    Adverse Action

The FCRA requires that, "before taking any adverse action based in whole or in part on [a background check] report, the person intending to take such adverse action shall provide to the consumer to whom the report relates[] (i) a copy of the report; and (ii) a description in writing of the rights of the consumer under this subchapter[.]" 15 U.S.C. § 1681b(b)(3)(A). Within the employment context, an "adverse action" is defined as "a denial of employment or any other decision for employment purposes that adversely affects any current or prospective employee," as well as "any action taken or determination that is[] adverse to the interests of the consumer." 15 U.S.C. §§ 1681a(k)(1)(B)(ii), (iv)(II). A "consumer" is the individual about whom information is collected — in this case, the employee or candidate who undergoes a background check. *See* 15 U.S.C. § 1681a(c) (defining "consumer" as "an individual"); *id.* § 1681a(d)(1)(B) (defining "consumer report" as information "used or expected to be used in whole or in part for

the purpose of serving as a factor in establishing the consumer's eligibility for . . . employment purposes").

In *Tapestry I*, this Court explained — relying on *Obabueki v. Int'l Bus. Machs. Corp.*, 145 F. Supp. 2d 371 (S.D.N.Y. 2001), *aff'd*, 319 F.3d 87 (2d Cir. 2003) (per curiam) — that "an internal decision by Tapestry to place an applicant 'on hold,' without more, is [not] an adverse action under the FCRA." *Tapestry I*, 2025 WL 504628, at *7; *see also id.* ("[A] company can, and indeed must, form an intent to take an adverse action *before* notifying an applicant that it may take such an adverse action." (quoting *Manuel v. Wells Fargo Bank, Nat'l Ass'n*, 123 F. Supp. 3d 810, 823 (E.D. Va. 2015)). The key to that holding, for purposes of Tapestry's present motion, is "without more." Indeed, the Court noted that Tapestry's "standard background-check process . . . appears to comply with the FCRA," but that Tapestry did not follow that standard process with Plaintiff, who had already begun working by the time of her background check. *Id.* at *8. Tapestry argues that its revocation of Plaintiff's conditional clearance and its barring her from the Scottsdale store was akin to an internal decision, and not an adverse action, for three reasons: (1) it was merely a "preliminary and tentative decision to disqualify Plaintiff from employment," (2) Plaintiff was given a meaningful opportunity to dispute FADV's report and thus change Tapestry's mind, and (3) Plaintiff was not immediately fired or disqualified, but rather was returned to her previous status as job applicant, and therefore the revocation "was an interim step rather than an ultimate employment action." Br. at 13-14. Plaintiff counters that nothing in the FCRA's text limits adverse employment actions "to the ultimate denial of employment," Opp. at 7; *see id.* at 10-11, and that "to the extent Tapestry is not simply wrong as a matter of law," then whether Tapestry took an adverse action against her requires factual findings as to "whether the action was adverse to Plaintiff's interests, whether it was

7

communicated, and whether it took effect," and "there is ample evidence" in her favor on these questions, *id.* at 8.  The Court agrees with Plaintiff, in part.

To begin, it is undisputed that Plaintiff was an hourly worker, rather than salaried.  *See* Dkt. 72-9 at 6 (listing Plaintiff's "[e]mployee [c]lassification" as "[h]ourly"); Def. RSUF ¶ 57. Therefore, Tapestry's decision to remove Plaintiff from the Scottsdale store during the FCRA-mandated dispute process deprived her of her wages for a period of time.  The parties have not provided case law indicating whether the FCRA would categorize such an employer action as preliminary, tentative, or interim rather than adverse.  The Court's own research yielded just one case addressing this question, *Moody v. Ascenda USA Inc.*, No. 16-cv-60364, 2016 WL 4702681 (S.D. Fla. July 1, 2016).  There, the defendant employer ran a background check on the plaintiff, a call-center operator, after she was already employed.  *Id.* at *1.  The background-check vendor returned a report indicating (incorrectly) that the plaintiff "had been convicted of petit theft and drug possession."  *Id.*  Upon receiving the report, but before furnishing a copy to the plaintiff or giving her an opportunity to respond to its contents, the employer suspended her without pay.  *Id.* "A week later," she successfully challenged the report and was cleared to return to work, but her employer "refused to compensate [her] for the days she was suspended," and as a result she lost "hundreds of dollars in pay which she never recovered."  *Id.*  The court found that these allegations were sufficient to plead that the employer had violated the FCRA.  *Id.* at *4-5.  In separately discussing the plaintiff's standing to bring the claim, the court noted that her "suspension without pay based upon the inaccurate convictions attributed to her in the report could well have been avoided" if her employer had "complied with . . . the FCRA by first providing [her] with a copy of the pertinent consumer report and a reasonable opportunity to respond to the information in [it] before taking adverse employment action against her."  *Id.* at *5.

While *Moody* is not binding authority, it is persuasive.  There, as here, the employer sent the plaintiff home because of the contents of her background check report; there, as here, the employer stopped paying the employee as an immediate consequence of that decision; and there, as here, the employer did not furnish a copy of the background check report to the plaintiff before taking those actions.  These facts make Plaintiff's situation unlike that in *Joseph v. Leavitt*, which Tapestry cites, who was placed on "administrative leave, *with pay*," while awaiting his employer's decision on his background check.  465 F.3d 87, 90 (2d Cir. 2006) (emphasis added).  Tapestry also cites *Brown v. N.Y.C. Transit Auth.*, No. 22-cv-02949 (ALC), 2024 WL 1347283 (S.D.N.Y. Mar. 29, 2024) in arguing that suspensions are not adverse actions, *see* Br. at 11, but the case stands for the opposite proposition.  That court held that the plaintiff, by alleging he had been suspended without pay during his employer's investigation, "sufficiently plead[ed] that he was subject to adverse employment action[] under his discrimination claim."  *Brown*, 2024 WL 1347283, at *10.  Moreover, both *Joseph* and *Brown* are Title VII cases, not FCRA, and to the extent case law concerning Title VII or other laws is analogous to the matter before this Court (as Tapestry argues it to be, *see* Br. at 11), that case law supports the premise that an unpaid suspension constitutes an adverse action under the FCRA. *Compare Leavitt*, 465 F.3d at 91 (holding narrowly "that administrative leave with pay during the pendency of an investigation does not, without more, constitute an adverse employment action" under Title VII), *with Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223-24 (2d Cir. 2001) (explaining that jury could find adverse employment action under ADA where "plaintiff was suspended for a week without pay" and therefore "may have at least suffered the loss of the use of her wages for a time"), *and Ihim v. St. Vincent's Hosp. Westchester*, No. 11-cv-08024 (JCM), 2015 WL 5698038, at *6 (S.D.N.Y. Sept. 25, 2015) (finding that plaintiff's unpaid

suspension "plainly constituted an adverse employment action" under Title VII, even though he was ultimately awarded back pay).

For the same reason, Tapestry's reliance on *Burghy v. Dayton Racquet Club, Inc.*, 695 F. Supp. 2d 689, 703 (S.D. Ohio 2010), is misplaced. In that case, the plaintiff's employer routinely conducted credit checks on its current employees "to ensure that they remain[ed] eligible for employment." *Id.* at 692. When one such routine check on the plaintiff returned information the employer deemed disqualifying, her supervisor called her in for a meeting and told her "to go home, and that she would never again report for work as an accounting assistant" there. *Id.* at 692. The employer provided a copy of the report to the plaintiff, but only after that meeting, attached to a pre-adverse action letter. *Id.* at 701. The employer later sent the plaintiff a second letter advising her that she had been fired. *Id.* As Tapestry itself notes, the *Burghy* court found that whether the plaintiff had been fired at the conclusion of the meeting (and thus before receiving a copy of her credit report) or by this second letter was a question of fact precluding summary judgment. *Id.* at 701-02. But more importantly for purposes of the present motion, the *Burghy* plaintiff was salaried, and she continued receiving pay after she had been sent home and "leading up to her eventual termination." *Id.* at 704. In other words, if the *Burghy* plaintiff was fired only by the second letter, then she was on a form of paid suspension leading up to that adverse action. *See id.* That is not what happened here. It is uncontested that Plaintiff received a copy of her background check report and had an opportunity to respond to it, JSUF ¶¶ 18-19; *see* Dkt. 72-9, but it is also uncontested that Plaintiff received that notice and opportunity only after being sent home without pay, and that she remained unpaid until Tapestry fired her. Pl. RSUF ¶¶ 30-31, 37; Def. RSUF ¶ 52.

Tapestry warns that, if its conduct here (which it views as a preliminary step) constitutes an "adverse action" under the FCRA, then so would other "interim steps" taken based on

information in a background report, such as delaying a start date, changing a position being offered, changing the work location, or altering other terms and conditions contemplated in a conditional offer, and all such steps would therefore require employers to give pre-adverse notice before taking them.  Br. at 16 & n.3.  The Court does not credit that slippery slope contention and addresses the facts presented here.  As to the circumstances here, and based on the Court's reading of the FCRA and its analysis of available case law, the Court cannot hold as a matter of law that Tapestry did *not* take an adverse action against Plaintiff, which is the only summary judgment motion presented to the Court.  Tapestry is therefore not entitled to summary judgment on the basis that there was no adverse action as a matter of law.

## II.    Negligence and Willfulness

Assuming that there was an adverse action taken, though, Tapestry is entitled to summary judgment because it did not act negligently or willfully.[1]

"[T]he FCRA 'is not a strict liability statute.'"  *Suluki v. Credit One Bank, NA*, 138 F.4th 709, 721 (2d Cir. 2025) (quoting *Obabueki v. Choicepoint, Inc.*, 236 F. Supp. 2d 278, 285 (S.D.N.Y. 2002), *aff'd*, 319 F.3d 87 (2d Cir. 2003) (per curiam)).  Rather, it imposes civil liability on "[a]ny person" who either negligently or willfully "fail[s] to comply with any requirement imposed under" the FCRA.  15 U.S.C. § 1681o(a) (negligently); 15 U.S.C. § 1681n(a) (willfully).  "A defendant who *willfully* violates the FCRA is liable for actual damages, punitive damages, and attorneys' fees.  A defendant who *negligently* violates the FCRA is liable only for actual damages and attorneys' fees."  *Suluki*, 138 F.4th at 721 (citations

---

[1] Although Tapestry's motion can be decided on negligence and willfulness alone, the Court included the analysis in Part I regarding the existence of an adverse action because "to prevent the law in this area from stagnating, courts should be reluctant to skip to the negligence or willfulness issue without answering the threshold question of whether the defendant violated the FCRA." *Grijalva v. ADP Screening & Selection Servs. Inc.*, 151 F.4th 1055, 1061 (9th Cir. 2025) (quoting *Marino v. Ocwen Loan Servicing LLC* , 978 F.3d 669, 671 (9th Cir. 2020)).

omitted).  As a threshold matter, the Court will set forth what negligence and willfulness mean within the unique context of the FCRA.

### A.    Legal Standard

For many statutes, as for most common law torts, *mens rea* requirements pertain to the defendant's state of mind regarding their conduct (or the risk their conduct creates), rather than the defendant's awareness that such conduct violates the law.  *See, e.g.*, *United States v. Hansen*, 599 U.S. 762, 781 (2023) ("Many criminal statutes do not require knowledge of illegality, but rather only 'factual knowledge as distinguished from knowledge of the law.'" (quoting *Bryan v. United States*, 524 U.S. 184, 192 (1998))); *Am. Sur. Co. v. Sullivan*, 7 F.2d 605, 606 (2d Cir. 1925) (Learned Hand, J.) ("The word 'willful,' even in criminal statutes, means no more than that the person charged with the duty knows what he is doing.  It does not mean that, in addition, he must suppose that he is breaking the law.").  In keeping with that general rule, the FCRA imposes on credit reporting agencies ("CRAs") (like FADV) and on information-furnishers (like the entity that provided FADV with incorrect criminal history records for Plaintiff) specific duties that, when negligently or willfully ignored, give rise to liability.  *See* 15 U.S.C. § 1681e(b) (requiring that CRAs "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates"); 15 U.S.C. § 1681s-2(a)(1)(A) ("A person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate.").  But the FCRA does not establish similar duties for employers (or other companies) who act upon a background check report.  Instead, under Supreme Court precedent, employer liability turns on the employer's understanding of the FCRA's requirements.

*Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007), is the foundational case.  There, an insurance company offered disadvantageous first-time rates to new customers based on their

credit history without sending pre-adverse action notices, such that customers were not "told if [they] would have gotten better terms with a better credit score." *Id.* at 54. The Supreme Court found that such a disadvantageous offer was an adverse action. *Id.* at 62-63. In determining whether taking that action without pre-adverse notice constituted a willful violation of the FCRA, the Supreme Court first held that the statute "reach[es] reckless FCRA violations" in addition to willful, *id.* at 57, and applied the common law's meaning of recklessness: "conduct violating an objective standard: action entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known,'" *id.* at 68 (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)). Thus, the Supreme Court held, "a company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69. Applying that standard, the *Safeco* court explained that the insurer had reasonably read the FCRA to require pre-adverse notice only when it "increase[d]" its rates, a statutory term the insurer understood to "presuppose[] prior dealing" and thus "exclud[e] initial rate offers for new insurance." *Id.* The Supreme Court "disagree[d] with [that] analysis" but noted that it "ha[d] a foundation in the statutory text, and a sufficiently convincing justification to have persuaded the [d]istrict [c]ourt to adopt it and rule in [the insurer's] favor." *Id.* at 69-70. Indeed, the Supreme Court continued:

> This is not a case in which the business subject to the [FCRA] had the benefit of guidance from the courts of appeals or the Federal Trade Commission (FTC) that might have warned [the insurer] away from the view it took. Before these cases, no court of appeals had spoken on the issue, and no authoritative guidance has yet come from the FTC (which in any case has only enforcement responsibility, not substantive rulemaking authority, for the provisions in question). Given this dearth of guidance and the less-than-pellucid statutory text, [the insurer]'s reading was not objectively unreasonable, and so falls well short of raising the "unjustifiably high risk" of violating the statute necessary for reckless liability.

*Id.* at 70 (citations omitted). And because the insurer's "reading of the statute, albeit erroneous, was not objectively unreasonable," the Supreme Court found that "there [was] no need to pinpoint the negligence/recklessness line" in deciding the matter. *Id.* at 69.

The parties here agree that the *Safeco* standard applies to Plaintiff's claim that Tapestry willfully violated the FCRA. *See* Br. at 20-21; Opp. at 19-20. But while both appear to agree that "reasonableness" should guide the Court's analysis on the question of Tapestry's negligence, neither provides authority setting forth what, exactly, that reasonableness analysis should entail. *See* Br. at 17-18 (arguing that reasonableness is "the touchstone" for a CRA's negligence and suggesting that the Court afford "[a] similar treatment" here); Opp. at 13-14 (agreeing that reasonableness is "a touchstone" for FCRA negligence but arguing merely that "reasonableness determinations are almost universally reserved for the jury"). The parties have not cited, and the Court is not independently aware of, any Second Circuit or Supreme Court case clearly addressing whether *Safeco*'s objective reasonability standard applies to negligence in addition to willfulness, but at least one court of appeals has held that it does. *See Grijalva*, 151 F.4th at 1060-61 ("To prove a negligent violation, a plaintiff must show that the defendant acted pursuant to an objectively unreasonable interpretation of the [FCRA]. To prove a willful violation, a plaintiff must show not only that the defendant's interpretation was objectively unreasonable, but also that the defendant ran a risk of violating the statute that was substantially greater than the risk associated with a reading that was merely careless." (quoting *Marino*, 978 F.3d at 673)). The Court finds that holding persuasive: It logically situates FCRA negligence within the same context and on the same continuum that *Safeco* established for FCRA recklessness and willfulness, such that negligence under the FCRA still requires consideration of whether there is an objectively unreasonable interpretation of the FCRA at play. *See Braun v. Client Servs. Inc.*, 14 F. Supp. 3d 391, 400 (S.D.N.Y. 2014) (explaining *Safeco* as "describing the

14

'negligence/recklessness line' in [the] FCRA as drawn between behavior that is 'merely careless' and behavior that is 'substantially greater' than careless" (quoting *Safeco*, 551 U.S. at 69)); *cf. United States v. Gentges*, 531 F. Supp. 3d 731, 747 (S.D.N.Y. 2021) ("[C]ivil recklessness requires proof of something more than mere negligence." (quoting *United States v. Horowitz*, 978 F.3d 80, 89 (4th Cir. 2020))).

Therefore, the Court will apply *Safeco*'s standard — as persuasively described in *Grijalva* — to the issue of Tapestry's negligence and willfulness.  Under that standard, the Court will look to the FCRA's text, court of appeals opinions interpreting the statute, and guidance from the FTC to determine whether it is an objectively reasonable conclusion to find that Tapestry did not take an adverse action against Plaintiff.  *See Suluki*, 138 F.4th at 724 (relying on these three sources in determining willfulness); *Fuges v. Southwest Fin. Servs. Ltd.*, 707 F.3d 241, 251 (3d Cir. 2012) (same).

### B.    Application

The Court begins with the FCRA's text.  As discussed, the FCRA defines "adverse action" as both "a denial of employment or any other decision for employment purposes that adversely affects any current or prospective employee," as well as "any action taken or determination that is . . . adverse to the interests of the consumer."  15 U.S.C. § 1681a(k)(1)(B)(ii), (iv)(II).  It thus requires that, "before taking any adverse action based in whole or in part on [a background check] report, the person intending to take such adverse action shall provide to the consumer to whom the report relates . . . (i) a copy of the report; and (ii) a description in writing of the rights of the consumer under this subchapter[.]"  15 U.S.C. § 1681b(b)(3)(A).

According to Tapestry, "the FCRA is silent on whether a pre-adverse action notice is required for every employment action preceding the ultimate denial of employment to a job

15

candidate." Br. at 21. Plaintiff disagrees: "[T]he explicit statutory definition mak[es] clear that 'adverse action' includes *any* decision adverse to consumers' interests . . . [and] [a]ny interpretation which ignores this broad reach (including *Obabueki*) cannot be considered a reasonable reading." Opp. at 20. To be sure, the statute is not silent in the way Tapestry suggests. *See* 15 U.S.C. § 1681a(k)(1)(B)(ii) (including "any other decision for employment purposes that adversely affects" the consumer in definition of "adverse action"); *id.* § 1681b(b)(3)(A) (requiring notice for any "adverse action"); *Wilson v. First Advantage Background Servs. Corp.*, 490 F. Supp. 3d 506, 515 (D. Conn. 2020) ("[T]he FCRA is not silent as to whether taking adverse action prior to sending a pre-adverse action notice . . . violates the FCRA."). But the real question is what "adverse" means, and the FCRA provides no clear answer. In fact, as Plaintiff's own argument demonstrates, the FCRA uses the term "adverse" to define the term "adverse": an "adverse action" under the FCRA is "a denial of employment or any other decision for employment purposes that *adversely* affects any current or prospective employee," as well as "an action taken or determination that is . . . *adverse* to the interests of the consumer." 15 U.S.C. § 1681a(k)(1)(B)(ii), (iv)(II) (emphasis added). The statute does not separately define "adverse."

"When a statute does not define a specific term, we 'look to its ordinary meaning found in "contemporary dictionary definitions."'" *Bloomberg L.P. v. U.S. Postal Service*, 118 F.4th 307, 317 (2d Cir. 2024) (quoting *Mader v. Experian Info. Sols., Inc.*, 56 F.4th 264, 269 (2d Cir. 2023)). While the FCRA was enacted in 1970, section 1681a(k) was added to the statute as part of the Consumer Credit Reporting Reform Act of 1996 (the "CCRA"). *See* Pub. L. No. 104-208 § 2402, 110 Stat 3009 at 426 (1996) ("Section 603 of the [FCRA] is amended by adding at the end the following new subsection [§ 1681a(k).]"). Thus, the Court looks to definitions of "adverse" contemporary to the 1996 amendment. At that time, the Oxford English Dictionary

16

("OED") defined the term as "[a]cting against or in opposition to, opposing, contrary, antagonistic, actively hostile," and as "[o]pposing any one's interests (real or supposed); hence, unfavourable, hurtful, detrimental, injurious, calamitous, afflictive." *Adverse*, Oxford English Dictionary (2d ed. 1989), https://www.oed.com/oedv2/00003294. Black's Law Dictionary similarly defined the term as "[o]pposed; contrary; . . . [h]aving opposed interests." *Adverse*, Black's Law Dictionary (6th ed. 1990)). Both sources' definitions began with the notion that "adverse" means "opposing" one's interests. Importing this definition into the FCRA lends support to Plaintiff's contention that barring her from the Scottsdale store, and thus depriving her of her wages, was an adverse action within the meaning of the FCRA: losing out on pay during that period surely opposed her interests. And indeed, this reading is persuasive to the Court as set forth in Part I. Yet the OED also provides a spectrum, from which one could understand "adverse" to mean something as minimal as "unfavorable" or as severe as "calamitous." Importing one of these heightened OED definitions into the FCRA supports Tapestry's reading that merely "returning Plaintiff to the position occupied by other job candidates who had not been 'conditionally cleared'" was not an adverse action under the FCRA, Br. at 3, even if it did deprive her of her wages for a few days.

Of course, a statute's "plain meaning 'does not turn solely on dictionary definitions of the statute's component words,' but is also determined by 'the specific context in which that language is used, and the broader context of the statute as a whole.'" *United States v. Rowland*, 826 F.3d 100, 108 (2d Cir. 2016) (alteration adopted) (quoting *Yates v. United States*, 574 U.S. 528, 537 (2015)); *see Eisenhauer v. Culinary Inst. of Am.*, 84 F.4th 507, 517 (2d Cir. 2023) ("To identify a statute's plain meaning, we afford words 'their ordinary, common-sense meaning' and 'draw[] on 'the specific context in which that language is used.'" (first quoting *United States v. Dauray*, 215 F.3d 257, 260 (2d Cir. 2000); and then quoting *Williams v. MTA Bus Co.*, 44 F.4th

17

115, 127 (2d Cir. 2022))).  Notably, in defining "adverse action," the FCRA also provides an insurance-specific meaning, in which an "adverse action" is not just "denial or cancellation of" coverage, but also "an increase in any charge for, or a reduction or other adverse *or unfavorable* change in the terms of coverage."  15 U.S.C. § 1681a(k)(1)(B)(i) (emphasis added).  The statute's use of the disjunctive supports a reading that "adverse," as used in this subsection of the FCRA, means something greater than merely "unfavorable" or "opposing."  *See Campos-Chaves v. Garland*, 602 U.S. 447, 457 (2024) ("The word 'or' is 'almost always disjunctive.'" (quoting *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 87 (2018))).  Thus, there is some statutory basis to support Tapestry's interpretation of the statute, even if the Court disagrees with that reading as set forth in Part I.  *See Safeco*, 551 U.S. at 69-70 (recognizing interpretation as objectively reasonable even while "disagree[ing] with" it); *see also Bhutta v. Vanhoc Transport Inc.*, 407 F. Supp. 3d 152, 154-57 (E.D.N.Y. 2018) (finding no willful violation, despite finding that defendant's failure to truncate credit card information from rental agreement violated statutory requirements for receipts, where statute does not define "receipt" but rental agreement contained sections more commonly associated with contracts than receipts, and therefore "[d]efendant's belief that the rental agreement falls outside the purview of [2003 FCRA amendment] is not without any foundation in the statutory text").  In other words, Tapestry's reading of the FCRA — that is, that revoking Plaintiff's conditional clearance and sending her home does not rise to the level of an adverse action, but rather "returning [her] to the position occupied by other job candidates who had not been 'conditionally cleared'" and thus "a return to the status quo," Br. at 3 — is not plainly foreclosed by the statutory text.

As to the second source of reasonableness under *Safeco*, Plaintiff has not pointed to any case where a court of appeals (or any court) found an adverse FCRA action under factual circumstances akin to those here, such that Tapestry's FCRA interpretation would be objectively

18

unreasonable under *Safeco*.  As stated previously, the Court's own research yielded just one pertinent district court case, *see generally Moody*, 2016 WL 4702681, which was not taken up by that jurisdiction's court of appeals.  And, although the Court here found persuasive Title VII case law in evaluating adverse actions, Plaintiff herself urges the Court to "disregard[] entirely" all such case law "given the existence of an FCRA-specific definition of adverse action."  Opp. at 12.  The Second Circuit and other courts have rejected claims of willful FCRA violations where there was a similar lack of appellate or FTC guidance.  *See Suluki*, 138 F.4th at 720, 724 (affirming summary judgment in favor of information-furnisher, and rejecting plaintiff's citation to one district court case as establishing basis for willful violation where case "comes from neither a court of appeals nor the Federal Trade Commission, and as far as we can tell, no agency or court of appeals has adopted or endorsed the district court's conclusions"); *Bhutta*, 407 F. Supp. 3d at 157 (holding that "during the relevant time period, [d]efendant was operating without any guidance from federal appellate courts or the FTC as to the definition of 'receipt[.]'"); *Landrum v. Harris Cnty. Emergency Corps*, 122 F. Supp. 3d 617, 625-26 (S.D. Tex. 2015) (granting summary judgment to employer on willfulness where "only two district courts had addressed" the conduct held to violate FCRA and each "reached a different conclusion," and where other available authorities provided equally conflicting guidance); *Just v. Target Corp.*, 187 F. Supp. 3d 1064, 1069-70 (D. Minn. 2016) (granting motion to dismiss willful claim where "the federal courts of appeals have provided no guidance as to the parameters" of relevant FCRA requirement, employer followed only FTC advisory opinions available, and statutory text "itself is less than clear").

In the absence of pertinent court of appeals authority, Plaintiff asserts that any reading of the FCRA that conflicts with hers, including *Obabueki*'s reading, is unreasonable.  *See* Opp. at 20.  Notably, however, the Second Circuit affirmed the district court's decision in *Obabueki* that

"[a]n internal decision to rescind an offer" due to the results of a background check did not constitute an adverse action, because the FCRA "expressly allows for the formation of an intent to take adverse action before complying with" the statute's pre-adverse action requirements. *Obabueki*, 145 F. Supp. 2d at 391-92. What's more, the expansive definition of adverse action that the *Obabueki* plaintiff pressed on appeal is akin to Plaintiff's broad framing here. *Compare* Appellant's Brief at 65, *Obabueki v. IBM Corp.*, 319 F.3d 87 (2d Cir. 2003) (No. 09-7499), 2002 WL 32487967, at *65 ("The FCRA defines 'adverse action' broadly to mean 'a denial of employment or any other decision for employment purposes that adversely affects any prospective employee.' Plaintiff's point is simple: [the employer]'s [preliminary] decision . . . to withdraw his job offer adversely affected him."), *with* Opp. at 12 (arguing that the FCRA "define[s] adverse action broadly to include all actions adverse to the consumer's interests," such as "when [an employer] withdraws rights and privileges associated with employment status[,] like being present in the store, working scheduled shifts, and being paid"); *see also* *Obabueki*, 319 F.3d at 88 (affirming district court opinion "[u]pon consideration of all of plaintiff's arguments on appeal"). Thus, by affirming *Obabueki*, the Second Circuit endorsed a narrower meaning of "adverse" than what Plaintiff proposes. In the absence of conflicting court of appeals authority, *Safeco* permits Tapestry to rely on *Obabueki* as further limiting the scope of "adverse action" under the FCRA, and as additional support for interpreting the statute to permit its conduct with respect to Plaintiff here as something more akin to an interim and internal decision than an adverse action against Plaintiff.

Finally, as to the third *Safeco* reasonableness source, neither party points to any clear FTC guidance addressing this specific factual circumstance. Plaintiff cites just one FTC advisory opinion for the proposition that it is important to inform consumers of the negative contents of their reports so that they have an opportunity to correct them. *See* Opp. at 20 (citing

20

F.T.C., Advisory Opinion to Rosen (June 9, 1998), https://www.ftc.gov/legal-library/browse/advisory-opinions/advisory-opinion-rosen-06-09-98)).  But that merely echoes the FCRA's and CCRA's broad purposes, *see, e.g.*, *Dutta v. State Farm Mut. Auto. Ins. Co.*, 895 F.3d 1166, 1169 (9th Cir. 2018) (explaining that the "FCRA was enacted . . . 'to ensure fair and accurate credit reporting," and CCRA because "Congress recognized 'the significant amount of inaccurate information that was being reported by consumer reporting agencies and the difficulties that consumers faced getting such errors corrected'" (first quoting *Safeco*, 551 U.S. at 52; and then quoting S. Rep. No. 108-166, at 5-6 (2003)), which does little to inform the question of whether Tapestry's interpretation is objectively unreasonable.  *See Safeco*, 551 U.S. at 70 n.19 (declining to view FTC letter as sufficient guidance where it "did not canvass the [relevant] issue"); *United States ex rel. Schutte v. SuperValu Inc.*, 9 F.4th 455, 471 (7th Cir. 2021) ("*Safeco* suggests that authoritative guidance must have a high level of specificity to control an issue."), *vacated on other grounds*, 598 U.S. 739 (2023).  While FTC guidance cited by Tapestry also does not specifically address the facts of this case, *see* Br. at 22, it does suggest a narrower reading of the actions deemed adverse by the FCRA than what Plaintiff proposes.  *See 40 Years of Experience with the Fair Credit Reporting Act*, 2011 WL 3020575, at *75 (July 1, 2011) (stating that adverse action notices are required for "an individual who has applied for employment and has been *rejected* based on a consumer report," as well as for "an existing employee who is subject to an employment decision that adversely affects his or her employment, such as *termination or discipline*" (emphasis added)).  Indeed, this guidance comports with the narrower reading of the statute suggested above, under which, to be "adverse" within the meaning of the FCRA, the action taken must be something more than merely "unfavorable" to or "opposing" the consumer's interests.

21

Plaintiff's additional arguments in opposition largely skirt the *Safeco* standard and are, therefore, unavailing.  Primarily, Plaintiff contends that negligence and willfulness under the FCRA (or any other statute) always require determination by a jury.  *See* Opp. at 13-14 (arguing that there is "no basis in law or precedent" for resolving negligence "as a matter of law," and that the issue is "universally a jury question"); *id.* at 17 (arguing that "courts are legion in holding that a jury should determine at trial whether any FCRA violation was willful").  In support of this purportedly bright-line rule, Plaintiff cites several cases from other circuits suggesting that the inquiry inherently involves factual questions.  *See, e.g.*, *Manuel*, 123 F. Supp. 3d at 829 (denying summary judgment motion where defendant "pointed to several cases that support" its FCRA interpretation but provided "no evidence that anyone at [defendant's company] ever relied upon those opinions" when taking allegedly violative action); *Heaton v. Social Fin., Inc.*, No. 14-cv-05191, 2015 WL 6744525, at *7 (N.D. Cal. Nov. 4, 2015) (denying summary judgment motion and "find[ing] that *Safeco* cannot stand for the proposition that [d]efendants can prevail on summary judgment without providing sufficient evidence of their interpretation of the statute for the [c]ourt to determine if such an interpretation was objectively unreasonable").  But those cases are out of step with controlling authority from the Second Circuit, which, "[l]ike the other Circuit Courts to have addressed this question, [has] reject[ed] the proposition that a defendant must show that it actually and contemporaneously adopted a particular statutory interpretation to avail itself of the *Safeco* defense."  *Shimon v. Equifax Info. Servs. LLC*, 994 F.3d 88, 94 (2d Cir. 2021).  Rather, "whether a company committed a willful violation of the FCRA must be an objective inquiry," such that "willfulness [i]s a question of law' that 'concerns *objective* reasonableness, not anyone's state of mind.'"  *Id.* (quoting *Van Straaten v. Shell Oil Prods. Co. LLC*, 678 F.3d 486, 491 (7th Cir. 2012)); *see also Fuges*, 707 F.3d at 251 ("*Safeco* requires only that 'the company's reading of the statute is objectively reasonable,' and that the interpretation

22

that would allow the conduct in question is 'an interpretation that could reasonably have found support in the courts,' [but it] does not require that the defendant actually have made such an interpretation at any particular point in time." (citation omitted) (quoting *Safeco*, 551 U.S. at 70 n.20)).  Under this authority, there is little here for the Court to put in a jury's hands.

Moreover, even in cases involving CRA or furnisher defendants, where the willfulness/negligence standard is not wholly objective, the FCRA is not an automatic shield from summary judgment.  *See, e.g.*, *Podell v. Citicorp Diners Club, Inc.*, 112 F.3d 98, 103-104 (2d Cir. 1997) (affirming summary judgment in favor of CRA on plaintiff's claims of negligent and willful noncompliance where plaintiff "failed to demonstrate a genuine material question regarding [the CRA]'s compliance with the reinvestigation procedures of FCRA"); *Ostreicher v. Chase Bank USA, N.A.*, No. 19-cv-08175 (CS), 2020 WL 6809059, at *5 (S.D.N.Y. Nov. 19, 2020) (granting summary judgment to information-furnishing bank on plaintiff's claim that it had negligently or willfully violated FCRA where plaintiff provided no evidence bank had provided inaccurate information to credit reporting agency); *McCauley v. Trans Union LLC*, No. 02-cv-04042 (VM), 2003 WL 22845741, at *4 (S.D.N.Y. Nov. 26, 2003) (denying summary judgment on FCRA negligence claim, but granting summary judgment on FCRA willfulness claim where "[t]here is no indication, nor does [plaintiff] allege, that [defendant] intentionally produced an inaccurate credit report").  Accordingly, the Court cannot apply the bright-line rule Plaintiff suggests to deny Tapestry's motion.

Next, Plaintiff argues that Tapestry acted both negligently and willfully because it "is well aware of its FCRA obligation to provide consumers with notice and a copy of the relevant background report before taking any adverse action, and expressly chose to withhold the report until after ensuring that the adverse action had been carried out."  Opp. at 14; *see also id.* at 20-21 (similar).  But that argument seeks to apply a traditional negligence and willfulness test,

focusing on Tapestry's subjective intent, rather than evaluating what the statute could reasonably be interpreted to allow, as *Safeco* dictates. *See Shimon*, 994 F.3d at 94 (holding that "whether a company committed a willful violation of the FCRA must be an objective inquiry," such that "willfulness [i]s a question of law' that 'concerns *objective* reasonableness, not anyone's state of mind.'" (quoting *Van Straaten*, 678 F.3d at 491)); *cf. Grijalva*, 151 F.4th at 1065 (noting that "the objective reasonableness of a legal interpretation is a matter of law, regardless of whether willfulness may be a question of fact," finding that "as a matter of law," CRA's "interpretation of the FCRA was not objectively unreasonable," and explaining that this conclusion was "sufficient to make th[e] determination" that "no reasonable jury could find that [its] violation of the FCRA was negligent or willful").

In sum, the Court, having analyzed the *Safeco* factors, finds that Tapestry's reading of the FCRA was not objectively unreasonable, particularly given the lack of clarity of the statutory text and the lack of on-point court of appeals case law and FTC guidance. On this basis, the Court finds as a matter of law that Tapestry's potential FCRA violation was neither negligent nor willful. *See Safeco*, 551 U.S. at 69 (explaining that "there is no need to pinpoint the negligence/recklessness line" where defendant's interpretation "was not objectively unreasonable"). This finding renders academic the parties' arguments as to damages. *See* Br. at 19-20; Opp. at 14-17. The Court acknowledges that the *Safeco* test creates some difficulty for employees and job candidates seeking to avail themselves of the FCRA's private right of action. Indeed, as the Ninth Circuit explained in *Grijalva*, "[u]nder either the negligence or willfulness standard, when the applicable language of the FCRA is 'less than pellucid,' a defendant will nearly always avoid liability so long as an appellate court has not already interpreted that language." *Grijalva*, 151 F.4th at 1061 (citation omitted) (quoting *Marino*, 978 F.3d at 673-74). However, it is the analysis that the Court must apply. Given that no appellate court (or even a

consensus of lower courts), or the FTC, has clarified whether pausing a conditional, non-salaried worker's schedule while a background check result is being contested is an adverse employment action, the Court cannot find that Tapestry negligently or willfully violated the FCRA. Accordingly, because "the FCRA 'is not a strict liability statute,'" *Suluki*, 138 F.4th at 721 (quoting *Obabueki*, 236 F. Supp. 2d at 285), Tapestry's motion for summary judgment is granted, and the case is dismissed.

## CONCLUSION

For the foregoing reasons, Tapestry's motion for summary judgment is GRANTED.  The Clerk of Court is respectfully directed to close the case.

Dated: March 26, 2026
      New York, New York

SO ORDERED.

JENNIFER L. ROCHON
United States District Judge